**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEROME L. HARRIS (#R-12141), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 6435 |
| | ) | |
| EDITH NEWMAN, et al., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerome Harris claims he was medicated and disoriented when he signed forms requesting admission to, and treatment at, Madden Mental Health Center ("MMHC"), a mental health facility operated by the Illinois Department of Human Services. In this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendants, Dr. Muhammad Nasib and Dr. George Miguel, psychiatrists at MMHC, deprived him of his liberty without due process of law by having him "voluntarily" committed to MMHC at a time when he was incompetent to consent to his admission. Plaintiff also brings state-law claims of medical malpractice and false imprisonment. Defendants' have moved for summary judgment [36]. For the reasons explained herein, Defendants' motion is granted.

## BACKGROUND

The following facts are drawn from the pleadings and Defendants' Local Rule 56.1 submission.[1] On the morning of Monday, June 21, 2010, Plaintiff approached a police squad car, got in the backseat, and reported that a child in his family was a danger to himself and others and needed professional help. (Deposition of J. Harris ("Harris Dep."), Ex. 3 to Defs.' Mot. For Summ. J., at 10:7-11:3, 79:16-22.) For reasons unexplained in this record, the officers took Plaintiff to St.

---

[1]     Defendants provided Plaintiff with the appropriate LR 56.2 notice *see Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992); *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982), but Plaintiff never responded to Defendants' Rule 56.1 submission or filed a Rule 56.1 submission of his own.

Mary of Nazareth Hospital ("Nazareth") in Chicago.[2]  (*Id.* at 10:1-11:24.)  When he arrived at

Nazareth, Plaintiff felt threatened and refused to enter the hospital.  (*Id.* at 11:17-12:2, 79:23-80:5.)

Plaintiff was taken inside by force, placed in restraints, and injected with an unknown medication.

(*Id.*)  Later that evening, Plaintiff was transferred from Nazareth to MMHC.  (*Id.* at 9:20, 10:1-3,

12:1-2.)

MMHC is a mental health facility located in Hines, Illinois and operated by the Illinois

Department of Human Services.  (Declaration of Muhammed Nasib (hereinafter "Nasib Decl."), Ex.

1 to  Defs.' Mot. For Summ. J., ¶ 3; Declaration of George Miguel (hereinafter "Miguel Decl."), Ex.

2 to  Defs.' Mot. For Summ. J., ¶ 3.)  Defendants, Dr. Muhammed Nasib ("Dr. Nasib") and Dr.

George Miguel ("Dr. Miguel"), are psychiatrists employed at MMHC.  (Nasib Decl. ¶ 2; Miguel Decl.

¶ 2.)  At approximately 11:00 p.m. on June 21, 2010, Dr. Miguel evaluated Plaintiff.  (Miguel Decl.

¶ 4.)  The record does not reflect whether Dr. Miguel knew that Plaintiff had been medicated at

Nazareth; nor is there any indication whether Dr. Miguel had received any records from Nazareth

before he evaluated Plaintiff.

Dr. Miguel claims that in evaluating Plaintiff's capacity to consent to mental health treatment,

he followed the procedures in the Illinois Mental Health and Developmental Disability Code's

provisions on voluntary admission.  (*Id.* ¶¶ 5-6.)  Specifically, the Code provides:

> b)      For purposes of consenting to voluntary admission, a person has the
>         capacity to consent to voluntary admission if, in the professional judgment
>         of the facility director or his or her designee, the person is able to understand
>         that:
>
>         (1)      He or she is being admitted to a mental health facility;
>
>         (2)      He or she may request discharge at any time. The request must be
>                  in writing, and discharge is not automatic;

---

[2]      The record does not reflect why Plaintiff was taken to Nazareth, or what, if any,
treatment he received at that facility.

(3)     Within 5 business days after receipt of the written request for discharge, the facility must either discharge the person or initiate commitment proceedings.

405 ILCS 5/3-400(b).   It was Dr. Miguel's professional opinion that these requirements were met–that is, that Plaintiff was able to understand that he was being admitted to a mental health facility, that Plaintiff understood he could submit a written request for discharge at any time, and that Plaintiff knew that within five business days of submitting a written request for discharge, MMHC would either discharge him or initiate civil commitment proceedings.  (Miguel Decl. ¶ 7.)  As part of the admission procedure, Dr. Miguel completed a form titled "Physician Assessment of Patient's Capacity to Understand Voluntary Admission Status."  Dr. Miguel checked the "Yes" boxes beside the following statements on that form: "The patient understands that he/she is being admitted to a psychiatric hospital for treatment:" and "The patient understands that release for [sic] the hospital may not be automatic, and he/she can get help from staff to initiate procedures for release[.]" (Miguel Decl. ¶ 12; Physician Assessment of Patient's Capacity to Understand Voluntary Admission Status, Ex. 2-D to  Defs.' Mot. For Summ. J., at 1.)

Plaintiff was asked to sign forms giving his consent to admission and treatment.  Plaintiff did sign an Application for Voluntary Admission, which states in part:

YOU HAVE THE RIGHT TO REQUEST DISCHARGE FROM THIS FACILITY. YOUR REQUEST MUST BE IN WRITING. AFTER YOU GIVE YOUR REQUEST, THE FACILITY MUST DISCHARGE YOU AT THE EARLIEST APPROPRIATE TIME. THIS TIME MAY NEVER EXCEED 5 DAYS, EXCLUDING SATURDAYS, SUNDAYS, AND HOLIDAYS . . . .

(Miguel Decl. ¶ 8; Application for Voluntary Admission, Ex. 2-A to  Defs.' Mot. For Summ. J., at 2.) (emphasis in original).  Plaintiff also signed a Consent for Services Form, which states in part that the: "nature and purpose of the services, possible alternative methods of achieving this purpose, risks involved, and any possibility of a complication have been explained to me by Dr. Miguel and I understand the explanation."  (Miguel Decl. ¶ 9; Consent for Services Form, Ex. B to Defs.' Mot.

For Summ. J., ¶ 4.) Finally, Plaintiff signed a Consent to Medication, agreeing specifically to take Risperidone.[3] (Miguel Decl. ¶10; Consent to Medication, Ex. C to Defs.' Mot. For Summ. J. at 1.)

Plaintiff now does not remember being transported to MMHC, on June 21, 2010, and has no clear recollection of his first day at that facility. (Harris Dep. at 11:17-12:2, 13:20-14:13, 80:6-7.) Plaintiff explains that his first day at MMHC "was blurry" due to the medication he received at Nazareth, and he recounts difficulty "making sense of it all." (*Id.* at 13:20-14:13.) Plaintiff recalls being evaluated by a psychiatrist, and believes he told that doctor that he was not supposed to be there and that he wished to go home. (*Id.* at 14:14-18, 16:3-7, 80:6-11.) Plaintiff does not deny that his signature appears on all of the aforementioned admission documents, however; he simply has no recollection of filling out any paperwork on his first day at MMHC. (*Id.* at 16:14-22:2.) Plaintiff also has no recollection of anyone speaking to him about Risperidone or being told about his right to be discharged. (*Id.* at 18:14-16, 21:6-14.)

The following day (Tuesday, June 22, 2010), Plaintiff told unidentified doctors and staff members that he wanted to go home, and he signed a Request for Discharge. (*Id.* at 23:12-21, 23:11, 29:4-22, 32:15-21, 80:9-10; Request for Discharge at 1.) The Request for Discharge states in part that Plaintiff requested to be discharged "at the earliest appropriate time, not to exceed five days, excluding Saturdays, Sundays, and holidays[.]" (Request for Discharge at 1.) That day, Plaintiff also signed an "Initial Nursing Assessment Addendum" and a "Rights of Individuals Receiving Mental Health and Developmental Disabilities Services" form. (Harris Dep. at 24:12-14, 26:14, 29:9.) In the Initial Nursing Addendum, Plaintiff noted that he preferred the use of emergency medications over seclusion or restraints in an emergency situation. (Initial Nursing Addendum, Ex. 4 to Defs.' Mot. For Summ. J., ¶ 5.) The Rights of Individuals Receiving Mental

---

[3]     Risperidone is an atypical antipsychotic drug used for the treatment of schizophrenia, bipolar disorder and behavior problems in people with autism. MAYOCLINIC.COM, (Feb. 12, 2012), http://www.mayoclinic.com/health/drug-information/DR601563.

Health and Developmental Disabilities Services form states in part: "If you are over 18 and do not have a guardian, you have the right to refuse services, including medication[.]"  (Rights of Individuals Receiving Mental Health and Developmental Disabilities Services form, Ex. 5 to Defs.' Mot. For Summ. J., at 2.)

Plaintiff asserts that he was diagnosed with a drug induced mood disorder.[4]  He remained at MMHC for the next 7 days receiving treatment and awaiting discharge.  (Harris Dep. at 39:9-15.) During this period, Plaintiff claims, he repeatedly told the doctors that he encountered that he was not supposed to be there and was ready to leave.  (*Id.* at 32:15-21, 39:4-8, 40:9-41:7, 80:6-11.) Believing he needed to cooperate with the doctors and staff in order to be released, Plaintiff did participate in therapy and other activities.  (Harris Dep. 33:14-34:2.)  He acknowledges, further, that during his hospitalization at MMHC, he was never restrained, given injections, or forced to take medication.  (*Id.* at 35:7-24, 44:21-25, 45:3-7, 47:10-11, 67:16-22.)  Plaintiff did take Risperidone daily; he claims he told unidentified staff members that he should not be on that medication, but he went on taking it because he was advised (he does not say by whom) that he had to take the medication to be released.  (*Id.* at 35:6-20, 80:12-16.)  In fact, Plaintiff continued taking Risperidone for approximately four days after his release from MMHC.  (*Id.* at 47:10-11, 67:16-22.)

On June 28, 2010, Dr. Nasib met with Plaintiff in preparation for his discharge.  Dr. Nasib gave Plaintiff a prescription for a two-week supply of Risperidone and a referral to an outpatient psychiatric clinic.  (Nasib Decl. ¶ 6; Harris Dep. at 46:1, 47:5.)  Plaintiff did not fill the prescription or seek treatment at the outpatient clinic.  (Harris Dep. at 49:20-23, 50:9-16.)  There is no evidence that Dr. Nasib was involved in evaluating or admitting Plaintiff on June 21, 2010, or that he participated in Plaintiff's treatment prior to the pre-discharge meeting.  (Nasib Decl. ¶¶ 4-5.)  On June 29, 2010, Plaintiff was released from MMHC.  (Nasib Decl. ¶ 7; Harris Dep. at 45:18-20.)

---

[4]        The record does not reflect when, or by whom, Plaintiff was diagnosed.

Plaintiff alleges that his confinement at MMHC and the medication he was given caused him to suffer anxiety and depression. (Harris Dep. at 80:17-21.) In the days following his discharge from MMHC, Plaintiff had four episodes that he describes as panic or anxiety attacks. (*Id.* at 47:8-16, 53:16-17, 54:23, 55:21, 57:4-5.) Plaintiff did not receive treatment for any of these attacks; he did go to a hospital after one of the attacks, but left the hospital before being evaluated or treated. (*Id.* at 56:4-7, 56:23-57:1, 80:22-24.) Plaintiff had his last panic attack on July 7, 2010, during an arrest. (*Id.* at 57:13-20; 58:6-17.) The arresting officers called an ambulance because Plaintiff displayed panic symptoms, but paramedics told Plaintiff he was "fine" and did not take him to a hospital. (*Id.*) Plaintiff suspects that the medication he was prescribed at MMHC was the cause of his anxiety attacks because those attacks ceased when he stopped taking the medication. (*Id.* at 80:21.)

Plaintiff started suffering from symptoms of depression approximately two months later, in September of 2010. (*Id.* at 76:3-77:3) While incarcerated at Stateville Correctional Center for unlawful use of a weapon, Plaintiff reported his anxiety attacks and symptoms of depression to a prison physician. (*Id.* at 58:18-59:16, 76:3-77:3, 77:10-78:10.) Plaintiff took Prozac by prescription for a few months, and his symptoms of depression ended a few weeks after he began taking the medication. (*Id.* at 58:18-59:16, 76:3-77:3, 77:10-78:10.) Plaintiff claims he has never been diagnosed with an anxiety disorder, and he is uncertain whether he has ever been formally diagnosed with depression. (*Id.* at 58:18-20; 68:15; 69:7, 76, 3-8, 78:1-3.) In any event, no record evidence establishes such a diagnosis, and no medical or psychiatric professionals have opined that the symptoms Plaintiff reports suffering after his release from MMHC were caused by his hospitalization or by the medication he was given. (*Id.* at 69:10; 70:8; 76:3-11; 78:2-3.) Finally, Plaintiff has not incurred any medical expenses in connection with his panic attacks or depression. (*Id.* at 62:9-22, 75:4-6.)

## DISCUSSION

### Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Wackett v. Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). "'A court must grant a motion for summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Peretz v. Sims*, 662 F.3d 478, 480 (7th Cir. 2011), quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). The court will review facts and inferences in the light most favorable to Plaintiff Harris on this motion, but because he has not responded to the motion for summary judgment as directed by the court's rules, the court is free to consider the facts presented in Defendants' statement of undisputed facts, still viewing those facts in the light most favorable to Harris. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir.2006), cited in *Peretz*, 662 F.3d at 480; FED. R. CIV. P. 56(e)(2).

### Procedural Due Process

To succeed on a 42 U.S.C. § 1983 action, a plaintiff must be able to establish that the defendant committed a violation of constitutional or federal law. *See Brokaw v. Mercer Cnty*, 235 F.3d 1000, 1009 (7th Cir. 2000). Plaintiff contends he was deprived of his liberty interest in avoiding confinement in a mental hospital without either consent or the procedural safeguards of the involuntary commitment process. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Id.* at 1020 (internal quotation and citation omitted).

In assessing a procedural due process claim, the court engages in a two-step inquiry, considering (1) whether the defendants deprived the plaintiff of a constitutionally protected liberty

or property interest; and (2) whether the deprivation occurred without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125, (1990); *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002).

The court notes, first, that there is no evidence that Dr. Nasib had any personal involvement in Plaintiff's admission to or treatment at MMHC prior to his discharge. Liability under the Civil Rights Act requires a defendant's personal involvement in any alleged constitutional violations. *See Palmer v. Marion Cnty*, 327 F.3d 588, 594 (7th Cir. 2003). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005). Dr. Nasib merely met with Plaintiff on June 29, 2010, in preparation for Plaintiff's discharge. He gave Plaintiff a two-week prescription for Resperidone and a referral to an outpatient clinic. Plaintiff did not fill the prescription or seek treatment at the outpatient clinic. (Harris Dep. at 49:20-23, 50:9-16.) Since Dr. Nasib played no role in admission to MMHC or the treatment Plaintiff received while confined there, Dr. Nasib is entitled to summary judgment on Plaintiff's § 1983 claim.

Dr. Miguel was involved in the process of admitting Plaintiff to MMHC. Defendants argue that Plaintiff has waived any due process challenge to his admission and treatment at MMHC, however, because he consented to voluntary hospitalization, treatment, and medication. An individual may certainly waive his or her procedural due process rights. *See Domke v. Portage Cnty*, 523 F.3d 776, 781 (7th Cir. 2008) (citing *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972)). A constitutional waiver is considered to be valid if it is knowing and voluntary. *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (a waiver ordinarily is "an intentional relinquishment or abandonment of a known right or privilege"); *see also United States v. Hill*, 252 F.3d 919, 923 (7th Cir. 2001) (knowing and intelligent waiver "is demonstrable knowledge of the right being surrendered and a formal decision to forego that right"). Plaintiff consented to voluntary admission,

Defendants urge, when he signed the Application for Voluntary Admission and other admission documents. These documents advised Plaintiff of his rights regarding discharge, request for discharge, and the five-day statutory limit on voluntary admission. Further, the Consent for Services and Consent to Medication describe the treatment Plaintiff would receive, including evaluation, medical management, and administration of Risperidone. Defendants argue that Plaintiff's admission to MMHC, the treatment he received, and his discharge were carried out pursuant to the terms to which Plaintiff consented and in accordance with the Illinois Mental Health and Developmental Disability Code. *See* 405 ILCS 5/3-400(b).

Plaintiff does not deny that he signed all the forms evidencing his consent, but he insists that his admission and treatment were nevertheless involuntary because he lacked the capacity to consent when he was admitted to MMHC. (See Pl.'s Am. Compl. [7] at 4; Pl.'s Resp. at 1.) In Plaintiff's view, Dr. Miguel knew or should have known that Plaintiff was under the influence of the drugs he was given at Nazareth and was thus incompetent to give informed consent to his admission. Dr. Miguel should have waited, Plaintiff urges, until he was "in his right mind" before evaluating him or asking him to sign any paperwork. (Pl.'s Resp. at 1.) The problem with this theory is that there is no evidence that Dr. Miguel knew, or even that he should have known, that Plaintiff was not "in his right mind" at the time of the admission. To the contrary, as explained in Dr. Miguel's declaration, the doctor evaluated Plaintiff and found that he had the capacity to consent to voluntary admission in accordance with 405 ILCS 5/3-400(b). (Miguel Decl. ¶¶ 6, 7.) Dr. Miguel noted in the Physician Assessment of Patient's Capacity to Understand Voluntary Admission Status, and reiterated in his declaration, that it was his opinion that Plaintiff understood that he was being admitted to a psychiatric hospital for treatment and that his release might not be immediate upon request. The law requires that Dr. Miguel exercise his professional judgment in determining that Plaintiff could consent. *See Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). Unless there is a substantial departure from accepted professional judgment, establishing that the person

9

responsible did not base his decision on such a judgment, the decision of the doctor is presumptively valid. *Id.* at 323.

Plaintiff himself has only a "blurry" recollection of the circumstances of his admission. He has offered no evidence that Dr. Miguel departed from accepted professional judgment or that he failed to ensure compliance with the statutory standard for voluntary admission when he evaluated Plaintiff. While Plaintiff testified that he was injected with an unknown drug at Nazareth before being transported to MMHC, there is nothing in the record identifying the drug he was administered. There is also no evidence establishing that Dr. Miguel knew that Plaintiff had been medicated. Even if he was aware that Plaintiff had been medicated, there is no competent evidence of the effect, if any, that drug may have had on his capacity to consent when he was evaluated by Dr. Miguel several hours later. Plaintiff does recall being evaluated during his admission, and he has not suggested that he behaved in any manner that would have demonstrated that he lacked the capacity to consent. There is, thus, no evidence that anything Plaintiff said or did gave Dr. Miguel reason to believe that Plaintiff lacked the capacity to consent to his admission. A party cannot defeat summary judgment by relying on unsubstantiated facts or by merely resting on his pleadings. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Greer v. Bd. of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001). Absent evidence from which a trier of fact could question Dr. Miguel's judgment, Dr. Miguel is entitled to summary judgment on Plaintiff's § 1983 claim.[5]

**Plaintiff's State Law Claims**

Plaintiff's complaint also asserts state-law claims for false imprisonment and medical malpractice related to his confinement at MMHC and the medication he was given. The court notes that these claims appear to suffer from the same evidentiary deficiencies facing Plaintiff's due

---

[5]     In light of this conclusion, the court need not address Defendants' qualified immunity defense.

process claim.  Having disposed of the federal claim, however, the court declines to exercise jurisdiction over claims that arise only under state law.  "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claim." *Al's Serv. Ctr. v. BP Prods. North Am., Inc.*, 599 F.3d 720, 727 (7th Cir.2010).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [36] is granted with respect to Plaintiff's due process claims.  His state law claims are dismissed without prejudice.

ENTER:

Dated:  February 15, 2013

_____
REBECCA R. PALLMEYER
United States District Judge